This is a general election contest brought under the provisions of Act No. 24 of 1894.
The contestant, Thomas W. Serpas, who was the duly elected nominee of the Democratic Party for Police Juror of the Second Ward of the Parish of St. Bernard, and who is joined in this suit by fourteen other persons who allege themselves to be duly qualified voters in the said ward, charges that, in spite of the fact that he received 145 ballots, which constituted all of the legal votes cast in the general election which was held on April 16, 1940, the Commissioners of Election counted and tabulated 157 ballots for John Trebucq, whose name was not printed on the official ballot and who, according to allegations of the contestant and of the other petitioners, had not, at least ten days before the said general election, filed with the Clerk of the Twenty-Fifth Judicial District Court for the Parish of St. Bernard a statement as required by Article VIII, section 15 of the Constitution of Louisiana, as amended by Act No. 80 of 1934, p. 698, setting forth the correct name under which he might be voted for and containing a statement of his consent and willingness to be voted for at the said general election.
It is also alleged that, in spite of the illegality of the said count and tabulation *Page 348 
made by the said Commissioners of Election, the Board of Supervisors of Election illegally compiled and tabulated the said election returns and proclaimed the said John Trebucq to be the duly elected police juror for the said ward.
It is further alleged that not only does the said Constitution, as amended by the Act of 1934, prohibit the counting of any votes for any person whose name does not appear printed on the official ballots unless, at least ten days prior to the said election, such person shall have given the above-referred-to notice, but that, for still another reason, the said Trebucq could not be legally considered as a candidate, and this is the fact that he participated in the Democratic Primary Election held on January 16, 1940, and was defeated by the contestant, Serpas, who was duly declared Democratic nominee and whose name was, accordingly, printed on the general election ballots as the Democratic nominee.
Trebucq admitted that the Commissioners of Election had counted 157 ballots for him and that the Board of Supervisors of Election had proclaimed his election as Police Juror for the Second Ward of the Parish of St. Bernard, but he denied that the said votes counted for him had been illegally cast, averring that he had complied with the requirement of the constitutional amendment concerning the giving of the notice already referred to, and he denied that his participation in the Democratic Primary had had the legal effect of preventing him from becoming a "write-in" candidate in the ensuing general election.
There was judgment for the contestant, Serpas, and Trebucq has appealed.
There were three other cases which were tried together with this one under an agreement by which they were consolidated for trial in the district court. In each of the others, as in this, there was judgment for the contestant, and in each of the others there has already been a reversal by the Supreme Court, which, in each, has held the contestee, or "write-in" candidate, entitled to the particular office which was involved in each. Those other cases are: Nunez v. Plaisance, 196 La. 926, 200 So. 302, Campo v. Acosta, 196 La. 935, 200 So. 305, and Perez v. Hurstell,196 La. 936, 200 So. 305. The opinion on which all three decrees rest was rendered in the Plaisance case.
The general election was set for April 16, 1940, the name of each contestant was printed on the official ballot, and there was no other name printed thereon.
By Act No. 80 of 1934, section 15 of Article VIII of the Constitution of Louisiana was amended so as to read as follows:
"Provided that no person whose name is not authorized to be printed on the official ballot, as the nominee of a political party or as an independent candidate, shall be considered a candidate for any office unless he shall have filed with the Clerks of the District Court of the parish or parishes in which such election is to be held, or the Clerk of the Civil District Court of the Parish of Orleans if he be a resident of the Parish of Orleans, at least ten (10) days before the general election, a statement containing the correct name under which he is to be voted for and containing the further statement that he is willing and consents to be voted for for that office, and provided further that no commissioners of election shall count a ballot as cast for any person whose name is not printed on the ballot or who does not become a candidate in the foregoing manner."
Accordingly, in order that anyone might be a "write-in" candidate for whom votes cast might be legally counted, it was necessary that, "at least ten (10) days before the general election", he should have filed with the clerk of court the notice required by the said amendment. In the Plaisance case [196 La. 936, 200 So. 303], the Supreme Court has already said that, "for the purpose of this decision we may concede that April 5 was the last day within which the notices or statements could be filed", and in that case the court found that on April 5th the Clerk of Court with whom the notices might have been filed had left his office at about 9:30 o'clock in the morning to go on a fishing trip and was absent until the morning of April 8th. It also found that, though he had left his two daughters in charge of his office, neither of them was a deputy clerk, and that, therefore, after he left his office at 9:30 o'clock on that morning there was therein no one with whom the notices might have been effectively filed. The Supreme Court further found that, though the record did not show that the contestees had made any effort to locate the clerk so that the notices might have been filed with him, nor to ascertain whether there was in his office anyone with *Page 349 
whom the notices might have been effectively filed, such evidence was unnecessary since, as a matter of fact, there was no one in the office authorized to receive the notices. The Court held that under those circumstances the contestees had, in effect, complied with the requirement of the constitutional amendment by depositing in the United States Mail on April 5th their respective notices addressed to the said clerk of court, although those notices were not received in the office of the said clerk until the following day, which was the day after the final day on which the notices should have been delivered.
Counsel for contestant here declare that we are not controlled by the conclusion reached by the Supreme Court in those cases for three reasons: First, because they maintain that before us there is no evidence which establishes the facts which, in those other cases, the Supreme Court held justified the mailing of the notices on the last day. Second, because they maintain that, even if we had before us the identical record which the Supreme Court considered in those cases, still we should differ with the Supreme Court on the questions of fact which counsel say are presented and on which questions of fact they say the Supreme Court was obviously in error. Third, because they say that here the contestee, having been the unsuccessful candidate in the Democratic Primary, cannot be heard to contend that he may be a "write-in" candidate in the general election. On this last point this case differs from those which the Supreme Court has decided. None of the other contestees had been a candidate in the preceding primary.
It is true that, actually, there is in this court no transcript of the evidence which was adduced below, and it is equally certain that there must be evidence showing the reasons which prevent a "write-in" candidate from complying literally with the requirement of the amendment concerning the much-discussed notice, and, since the district judge in this case has found that the notice or statement did not reach the clerk's office until April 6, 1940, and has also found that "the contestee did not attempt to file the statement with the Clerk in any other manner, or at any prior time", it is obvious that, unless there is available to us evidence sufficient to justify this action, then we must hold that there was no compliance by the contestee, or "write-in" candidate, with the constitutional requirement and no justification for failure to comply and that no votes could legally have been counted for him.
The contestee admits that this transcript does not actually contain the evidence on which he relies, but he points to the certificate or note of the clerk which appears on the first page and which reads as follows:
"Note: The testimony taken in this case is identical with the testimony taken in the case of Andrew Nunez, et al., v. A.J. Plaisance, No. 2468, 25th Judicial District Court, Parish of St. Bernard, and is contained in the transcript in that case. These cases were consolidated for the purpose of trial, and the evidence is identical. The case of Andrew Nunez v. A.J. Plaisance is No. 35923, of the Supreme Court of Louisiana.
"(Signed) A.B. Nunez, Clerk, "25th Judicial District Court "St. Bernard Parish."
Counsel for contestant, appellee, in contending that, in spite of the above quoted note, we cannot give consideration to the transcript of the evidence which is contained in the record in the Supreme Court in the Plaisance case, relies on certain articles of our Code of Practice and on certain decisions of our Supreme Court. He points to articles 895, 896, 897, 602 and 603, all of which are, to some extent, pertinent and which do require that the evidence relied on must be contained in the transcript. And he cites Cooley v. Broad, 29 La.Ann. 71, Williamson v. Enterprise Brick Company, Inc., 190 La. 415, 182 So. 556, and State ex rel. Marrero v. Patterson, 134 La. 875, 64 So. 805, in each of which it it held that the evidence relied on must be contained in the transcript, and, pointing to the note above quoted, he also cites Stark v. Bossier, 19 La.Ann. 179, in which the Supreme Court said:
"The clerk is a ministerial officer, whose duty and power are well defined by law.
"After the appeal has been allowed and the surety given, the clerk of the Court from whose judgment the appeal is taken, shall make a transcript of all the proceedings, as well as of all documents filed in the suit and annex to the same the petition of appeal, in order that the same may be delivered to the appellant when demanded. C.P. Art. 585.
"The clerk then is to copy all the proceedings, and all the documents as he *Page 350 
finds them in the suit, without adding to or subtracting from them one single word. His duty was to copy the notes as they were filed, without making any remarks creating negative or affirmative evidence for either of the parties."
There are, however, three considerations which move us to conclude that the transcript in the Plaisance case may be considered by us: First, it is quite obvious that all parties and all counsel — even those representing the contestant — intended at all times, until the case was argued before us, that the evidence taken should be considered in all four cases. In the brief filed with us on behalf of the contestant are many pages of quotations from the evidence, the transcription of which is to be found only in the record in the Plaisance case. How, then, can counsel for Serpas, contestant, be heard to contend that that evidence should not be considered at all by us and, at the same time, rely upon it as sustaining the claims of their client. The second reason is that that same evidence was considered by the Supreme Court in the other two cases which it has already decided, although in neither of those other cases was there any transcript of the evidence, which, as we have said, is only to be found in the record in the Plaisance case. An inspection of the Supreme Court records in those other two cases discloses the fact that each of them contains a note made by the clerk of court in language identical with that which we have already quoted.
The third reason which prompts us to consider the transcript is the very practical one that, since the enactment of Act No. 234 of 1932, it is obvious that it is not the intention of the Legislature that a suit should be dismissed because of the failure to file in the appellate court a complete transcript. By that act is indicated plainly the intention that, in such case as this, an opportunity should be afforded for the completion of the transcript. If this opportunity should be afforded here, there cannot be the slightest doubt that we would then have before us the exact transcript which is now contained in the Plaisance record in the Supreme Court and which is readily available.
When we consider that transcript, we, of course, find before us the identical evidence which was before the Supreme Court when it considered the Plaisance case, and this brings us to the very interesting contention made on behalf of the contestant that we are not bound by the findings of the Supreme Court on questions of fact and that we would be justified in concluding from the record that in the Clerk's office, on April 5th, there were persons authorized to accept the notice had the contestee appeared to present it.
Counsel for the contestant contend that the Supreme Court has erroneously concluded that, as a matter of fact, no such persons were present. We do not think that the Supreme Court has treated the matter as a disputed question of fact, for that court has recognized that the two daughters of the clerk were present in the clerk's office but that court has said that, since they were not deputy clerks, they were not authorized to receive the said notices. Counsel contend that the clerk testified that he had authorized them to receive the notices and that, therefore, when the Supreme Court found that they were not authorized, it had found a fact obviously not justified by the record. But the Supreme Court did not find as a fact that the clerk had not authorized them to receive them, but that court found as a matter of law that that "personal" authority granted by the clerk was not effective for the reason that, since the constitutional amendment requires that the notice be filed with the clerk of court, a clerk has no legal authority to delegate anyone except a deputy to receive such a notice.
We, therefore, conclude that, as a matter of fact, the question of fact on which counsel contend we may differ with the Supreme Court is not presented, and that, as a matter of law, the Supreme Court has held that no one but the clerk or a deputy may receive the notice, and assuming, therefore, that we might, had we the temerity to do so, differ with the Supreme Court on a question of fact where we have before us the identical evidence which that court has considered, it is certain that we have not the power to effectively differ with that court on a question of law.
Counsel for contestant point out that the notice which the contestee mailed to the clerk of court made no reference to the constitutional amendment of 1934, but declared that it was being filed in compliance with Act No. 160 of 1932, and they argue from this that, since the Act of 1932 required that the notice be filed not less than three days before the election, the *Page 351 
contestee really did not intend to comply with the ten-day requirement of the constitutional amendment and that this was his reason for not appearing at the clerk's office and actually filing the document on April 5th, and they argue from this that the contestee did not even attempt to comply with the constitutional amendment of 1934.
But this same situation appeared in the Plaisance case, and, therefore, we conclude that, since this argument was not effective in the Supreme Court, it should not be effective here.
The only remaining contention is that, since Trebucq was the defeated candidate in the Democratic Primary, he is estopped to give the notice required by the constitutional amendment of 1934, which, in effect, is his declaration that he is a candidate for the office. This contention is based on the prohibition to be found in section 29 of Act No. 97 of 1922 (Dart's La. General Statutes, sec. 2679), reading as follows:
"No one who participates in the primary election of any political party shall have the right to participate in any primary election of any other political party * * * nor shall he be permitted to be himself a candidate in opposition to any one nominated at or through a primary election in which he took part."
As we have already said, Trebucq not only took part in the primary election on January 16, 1940, but he was a candidate for the nomination and in that primary election was defeated by Serpas, the present contestant. It is argued on behalf of Trebucq, the contestee, that this identical legal question has already been considered by the Supreme Court and that that court, in Lacombe v. Laborde, 132 La. 435, 61 So. 518, 521, has held that participation in a party primary does not disqualify the defeated candidate if, in the ensuing general election, he receives, in "write-in" votes, a majority of all the votes cast. And that is exactly what was held in that case. But the reason on which that result was based can no longer be used to sustain a similar conclusion here. When that case arose, the controlling statute was Act No. 49 of 1906, which, as we find in the Laborde case, provided, in section 27, that:
"Nor shall he (the defeated candidate) be permitted to be himself a candidate in opposition to any one nominated at or through a primary election in which he took part."
But there was no provision, as there now is in the constitutional amendment of 1934, that no votes might be counted if cast for a "write-in" candidate unless he should have given the notice as required by the amendment, showing the full name under which he might be voted for and setting forth his consent that he be voted for. The Supreme Court found that, although the candidate defeated in the primary might not again affirmatively take steps to make himself a candidate in the general election, there was nothing which prevented the counting for him of such "write-in" votes as his friends might cast for him; that, though he could not make himself a candidate, his friends might do so. But, at the present time, because of the constitutional amendment, no votes may even be counted for such a "write-in" candidate unless he shall have given the required notice; in other words, unless he shall have taken affirmative action to make votes for himself effective, and, if affirmative action on his part must be taken, then we think that the moment he takes that action he makes himself a candidate, which is exactly what the Act of 1922 provides that he cannot do when it says that no one who participates in the party primary "shall * * * be permitted to be himself a candidate in opposition to any one nominated at or through a primary election * * *".
The vast distinction, then, between the legal situation presented in the Lacombe case and that presented here lies in the fact that now the "write-in" candidate must take steps to qualify, and, in the instant case, has in fact taken those steps, whereas, in the Lacombe case, no such steps were necessary. That the Act of 1922 prevents one who has been an unsuccessful candidate in a primary from being a candidate in the ensuing general election has been the opinion expressed by the attorney-general of this state and his assistants on several occasions. See Opinions of Attorney-General, 1934-36, pp. 267, 268; 1936-38, p. 298.
Since Trebucq, by the Act of 1922, was prohibited from becoming a candidate, the fact that he is now held to have complied with the requirements of the constitutional amendment of 1934 does not alter the situation. He was not eligible to be a candidate and cannot hold the office, however greatly the number of votes cast for *Page 352 
him may have exceeded the number cast for Serpas.
And this brings us to the most interesting question of whether, because of his ineligibility, we should merely annul the election, or whether we should declare that Serpas, who received all of the legal votes, has been elected to the office in question.
As is pointed out in Payne v. Gentry, 149 La. 707, 90 So. 104, 106, McCreary, in his work on Elections, puts the question this way:
"Suppose the candidate who had received the highest number of votes for an office is ineligible, and that his ineligibility was known to those who voted for him before they cast their votes; are the votes then cast for him to be thrown out of the count, and treated as never cast, and should the minority candidate, if eligible, be declared elected in such a case?"
In the Gentry case and also in Bartmess v. Hendricks,150 La. 627, 91 So. 68 — both general election contest cases — and in Hall v. Godchaux, 149 La. 733, 734, 90 So. 145, a primary election contest case, the Supreme Court held that, where a majority of the voters had cast ballots for an ineligible candidate, whose name appeared on the official ballots, there should be merely annulment of the election, and that the candidate who had received only a minority of the votes should not be declared elected. And in all of those cases the court pointed out that this is the American rule, although the established English rule is just the contrary, provided the voters have been given notice of the ineligibility of the candidate who received a majority of the votes.
The American rule — that there must be another election — is based on the idea that it is undemocratic to declare elected to office a person who has not received the approval of a majority, or of at least a plurality of the voters, and also on the theory that, if the voters have cast their votes for an ineligible person, whose ineligibility is not chargeable to them and whose ineligibility they could be presumed to have been ignorant of, they should be given another opportunity to exercise the right to vote. In each of those cases the name of the ineligible candidate had been printed on the ballot and it was held in each that this gave the voters justification for assuming, without further investigation, that the persons named on the ballot were, in fact, eligible. In Payne v. Gentry, supra, the Supreme Court said:
"* * * a majority of the voters in this instance were deprived of their votes, or of the effect of them, which is the same, by the illegal action of the authorities in printing defendant's name on the ballot."
In Bartmess v. Hendricks, supra [150 La. 627, 91 So. 69], appears a similar thought:
"* * * a sufficient number of legal voters were deprived of their ballot, without fault of their own, to have changed the result of said election, for it is clear that the voters had a right to assume that all names appearing on the official ballot had been placed there legally, and they were not required to investigate before voting how such names came to appear thereon."
And in the Godchaux case [149 La. 733, 90 So. 151], also, there is a statement to the effect that voters are warranted in assuming that election officials have investigated the eligibility of the candidates before placing their names on the ballots:
"* * * the voters had the right, in these circumstances, to assume that those charged with the responsibility of seeing that the law had been complied with had done their duty."
But we think that the situation is different when voters undertake, by "writing in" the names of persons whose names do not appear on the ballot, to elect those persons to office, and that, in such cases, it is the duty of each voter to ascertain for himself and at the risk of casting an ineffective ballot whether the person for whom he desires to cast such a ballot is in fact eligible. In the Gentry case the Supreme Court pointed out the distinction between the act of election officials in printing on a ballot the name of an ineligible person and the act of an individual voter in writing in the name of someone not possessing the legal qualifications. The court said there:
"* * * This is not a case in which the voters have written, of their own motion, the name of a defeated primary candidate on the ticket, * * *."
Had the voters here made an inquiry, they would have discovered that Trebucq had been a candidate and had been defeated in the primary election which had preceded the general election. In fact, it does not require much imagination to conclude *Page 353 
that most of the voters who voted for him in the general election had voted for him in the preceding primary election and well knew that he had taken part in that election and had been defeated.
A similar situation was noticed by the Supreme Court in the Gentry case, as is evidenced by the following:
"* * * doubtless every voter knew that defendant had been defeated in the primary and had probably voted therein, * * *."
If, then, these same voters knew that Trebucq had been a candidate in the primary, they are presumed to have known that he was not eligible for election as a "write-in" candidate, for, as was also said in that (Gentry) case, "every voter is charged with a knowledge of the law". It follows that, if the voters, who ought to have known of the ineligibility of their candidate, nevertheless voted for him by "writing in" his name, they have no one to blame but themselves and cannot be heard to demand that they be given an opportunity to again exercise their right to vote.
We fully realize that a contrary result was reached in all three of the cases cited and we have not overlooked the fact that, in the Godchaux case, supra, the Supreme Court, in limiting its decree to the annulment of the election and in refusing to declare the election of "the next highest candidate", said:
"Plaintiff contends that we should not consider the votes cast for Judge Godchaux, and that he should be held to be the nominee because he received a majority of the remaining votes. However, this is contrary to the ruling of the national Congress and the courts of all the states of the American Union, with the exception of Indiana; * * *."
But, in each of the three cases cited, the reason given was that the voters had been misled by official acts of duly constituted officers.
Nor have we overlooked the fact that in each of the cases the result was reached in spite of the fact that it was shown that the voters who had cast votes for the ineligible candidate probably had "notice" of his ineligibility. But it is equally true that in each of those cases the court reached the conclusion that, in spite of this "notice", the voters were justified in assuming that the persons whose names had been placed on the ballot by duly constituted officials were eligible persons. In other words, the Supreme Court seems to have reached the conclusion that, in spite of a prima facie belief that the candidates might be ineligible, the voters could act on the presumption of eligibility resulting from the placing of the names on the ballot. As we have said, there is no such presumption here and we think the necessary conclusion is that those persons who either knew of the ineligibility of Trebucq, or could easily have ascertained that he was ineligible, have lost their votes, and that it does not follow, as in the other cases, that they are entitled to another opportunity to vote.
We think, under these circumstances, that their votes should be entirely eliminated, and the result of this will be that Serpas has received all of the legal votes which were cast. We conclude from this, as did our brother below, that Serpas has been elected to the office and that we should so declare.
The judgment appealed from is affirmed at the cost of appellant.
Affirmed.